Vanessa Reed **LONG**, Plaintiff–Appellant,

v.

Kenneth S. **APFEL**, Commissioner of Social Security, Defendant–Appellee.

No. 99–6426.

United States Court of Appeals, Sixth Circuit.

Jan. 9, 2001.

Before BOGGS, SUHRHEINRICH, and GIBSON,* Circuit Judges.

PER CURIAM.

The Commissioner of Social Security's final determination denied Vanessa Long disability insurance benefits under the Social Security Act. She appeals. Upon review of the record, we hold that there is substantial evidence to support the Commissioner's determination, and we therefore affirm the denial of benefits.

## I

Vanessa Long, a 26–year–old resident of Paducah, Kentucky, applied for Supplemental Security Income benefits on August 18, 1995. She had no significant work experience[1] and relied on AFDC and food stamps to support her three children, one of whom may also have a disability. She took care of her personal needs but welcomed her mother's help in looking after her children. Beginning on February 26, 1991, she claims, a combination of physical problems associated with her weight rendered her severely impaired and unable to work. She suffered from severe headaches, a pseudo tumor cerebri, and morbid obesity. However, she identified no specific work-related limitations resulting from her obesity or other conditions.

At the administrative hearing to review her application for benefits, Reed testified that she experienced all-day headaches twice a week. The prescription medication "Paxil" partially alleviated her headaches but "didn't completely stop them. It made them to where I could more or less tolerate them." She testified that, when a headache strikes, "[a]ll I can do is [lie] down where it's real quiet in a nice dark place and try to relax." Additionally, the shunt in her lower back (described below) caused discomfort: "it pulls real bad ... makes my back hurt ... shoots all the way back down the back of my leg ... makes my leg want to give out.... [I]t hurts usually, you know, when I'm trying to do a lot of stuff, you know. It bothers me all the time. I'm limited to everything that I try to do." She testified that she can sit, occasionally stand and move around, and bend over from a standing position to pick something up from the floor but claimed that she was "not supposed to lift over 10 pounds." She said that she can stand on her feet for 45 minutes to an hour at a time before pain begins, and that sitting, too, makes her uncomfortable. These impairments, Long claims, limit her ability to perform housework, although she can take care of personal needs like "bathing, dressing, [and] things of that nature." Long's extensive medical treatment history confirms the nature of her ailments but, consistent with her own description, discloses no severe work-related limitations.

During a January 1992 admission to Western Baptist Hospital, examinations revealed no significant visual, cerebellar, or locomotion abnormalities, but Dr. John E. Grubbs. M.D., diagnosed a pseudo tu-

---

* The Honorable John R. Gibson, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. Ms. Long worked as a cashier for approximately five hours per day four times a week in May and June, 1996, at a friend's convenience store, resulting in earnings of $95 per week. The Administrative Law Judge (ALJ) found this "an unsuccessful work attempt."

mor cerebri.[2] He recommended a series of lumbar punctures to alleviate pressure from excess spinal fluid associated with this condition. When the spinal taps failed to provide relief, Dr. Grubbs told Long that she would, sooner or later, need surgery to insert a shunt into her spinal cord to drain the fluid on an ongoing basis. On January 24, 1992, Dr. Robert P. Meriwether, M.D., implanted a lumboperitoneal shunt in Long's lower spine that drained excess spinal fluid into her abdomen so that she could evacuate it during urination. At this time, she weighed 269 pounds and stood 5'6" tall.[3]

Post-operative notes indicated that the surgery went well and show a recommendation that Long increase her activity as tolerated. In March 1992, both Drs. Meriwether and Grubbs noted that Long reported significant improvement since the surgery, with headaches occurring rarely, although she complained of pain in her abdomen, which she associated with the surgery. Dr. Meriwether's treatment notes for May 1992 relate that Long's headaches were "less intense and less frequent than before the shunt placement." In June 1992, Long no longer suffered from headaches, and the abdominal scar was "causing her much less difficulty ...." In September 1992, Long had "no complaints" of headaches and stated that she felt "normal ." Dr. Meriwether found her "neurologically intact."

In March 1995. Long went to the emergency room complaining of headaches. Two months later, emergency room records indicate, she had a urinary tract infection, a fever of 100 degrees, and "low back and flank pain. She ha[d] ... pain across her lower back and abdomen with frequent urination." She sought no further treatment at the time.

Dr. Grubbs's notes from December 6, 1995, observed that since the surgery, Long "had generally [sic] resolution of her symptoms with normalization of her vision corrected for nearsightedness and no significant headaches in that respect. She still continues to have migraine type headaches ... occurring once a week or so...." He was uncertain whether Long's pseudo tumor cerebri caused her headaches but noted that she complained of only "occasional low back pain with pain sometimes shooting in the area of the previous shunt." His examination revealed nothing unusual. On February 1, 1996, Dr. Grubbs noted that Long complained of "still having frequent headaches, even increasing headaches," and that she went to the emergency room for treatment of them on several occasions. Dr. Grubbs prescribed Paxil for the headaches. On February 21, 1996, Long remarked that Paxil had eliminated her headaches and that she felt "fine." In his treatment notes for February 29, 1996, Dr. Grubbs wrote, "She

2. As Long described it, a pseudo tumor cerebri occurs "when your body makes too much spinal fluid for your brain to absorb, and the spinal fluid sits on your brain, and it puts pressure on it and makes it swell."

3. Long failed to disclose specifics of her height and weight at various times throughout the course of her treatment and application for benefits. At the administrative hearing, she testified that she was 5'6" and weighed "over 300." She could not give a specific weight because, when she had been weighed last, she asked not to be told the actual figure.

Some of Dr. Grubbs's notes indicate Long reporting a weight of "around 340 pounds." An undated slip from RediCare walk-in care center submitted into the record after the administrative hearing reflected height of 5'4" and weight of 334 lbs. The ALJ found the lack of objectively verifiable data troubling. Long stresses on appeal that she could not undergo an MRI because she was too large to fit in the machine and that she required the assistance of five people in getting on a tilt table.

returns in follow up, says she has not had any headaches since starting on the medication. She feels very good and has lost 10 lbs. feeling fairly well.... The shunt path is nontender. Gait is normal.... [W]hen she has any mild breakthrough tendencies she takes over the counter Aleve 2 at a time and this wears off the headache and she is only having to do this on very rare occasion."

On December 22, 1995, non-examining state agency physicians reviewed the evidence in Long's medical history and determined that she could perform medium level work. They found that she could: (1) lift up to 50 lbs. occasionally and 25 lbs. frequently; (2) sit, stand, and/or walk about six hours in an eight-hour workday; (3) perform unlimited pushing and/or pulling and operate hand or foot controls; (4) climb ramps and stairs, balance, stoop, kneel, crouch and crawl occasionally, but (5) never climb ladders, ropes, or scaffolds and avoid working around "heights, hazardous machinery, etc." A re-assessment completed on April 2, 1996, reached the same conclusions.

After the August 20, 1996, administrative hearing, Long complained of frequent nausea and some bifrontal headaches, and Dr. Grubbs decided that he would consider increasing the dosage of Paxil.

The Social Security Administration initially denied Long's application for SSI benefits on January 2, 1996. She immediately sought reconsideration, but benefits were again denied on April 8, 1996. After the August 20th hearing that Long requested, the Administrative Law Judge rendered a decision on January 23, 1997, finding that Long did "not have any severe impairment which significantly limits her ability to perform basic work-related functions; therefore, the claimant does not have a severe impairment."[4] He specifically found Long's statements so unsupported by objective evidence as to severely undermine her credibility. On December 11, 1997, the Appeals Council summarily rejected her request for review, making the ALJ's ruling the final position of the Commissioner. Long filed a civil action in the United States District Court for the Western District of Kentucky on February 2, 1998. After receiving objections and replies to the recommendation of a magistrate judge, the district court affirmed the Commissioner, holding that the plaintiff failed to carry her burden of showing severe impairment. Neither the magistrate judge nor the district judge made any findings with respect to plaintiff's credibility.

Long timely appealed. She attacks as unsupported by substantial evidence the Commissioner's findings that her medical problems do not constitute a severe impairment and that her testimony was not credible.

---

4. In the ALJ's view:
   The record reveals that the claimant was able to perform work activity. Although she alleges that her physical condition precluded her ability to continue working, there is no corroborating evidence that the claimant's employment ended due to her physical condition.... Although limited, the claimant's ability to work and her ability to care for her personal needs and for the needs (to some extent) of her children fails to support her allegation of disability. This when considered with the lack of supporting objective evidence, the noted periods of time in which the claimant failed to seek medical care, and the lack of corroboration concerning the claimant's inability to work, so weakens the claimant's credibility that the Administrative Law Judge does not find the claimant's allegations of disability credible. There is no persuasive evidence that the claimant's obesity, history of headaches and shunt placement have resulted in significant vocational limitations.

## II

### A. Standard of Review

Under 42 U.S.C. §§ 405(g), 1383(c)(3), which provide for review of the Commissioner's decision by a civil action filed in federal district court, all reviewing courts must accept as conclusive "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence. . . ." 42 U.S.C. § 405(g); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "More than a scintilla of evidence but less than a preponderance," *Brainard v. Secretary of Health & Human Svcs.*, 889 F.2d 679, 681 (6th Cir.1989), substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (internal quotation omitted). If supported by substantial evidence, this court must approve the Commissioner's decision "even if that evidence could support a decision the other way." *Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir.1993); *see also Her v. Commissioner of Social Security*, 203 F.3d 388, 389–90 (6th Cir. 1999). Because appellate review is confined to determining (1) whether the Commissioner's findings are supported by substantial evidence, and (2) whether the ALJ employed the proper legal standards in reaching his conclusion, this court may "not review the evidence de novo, make credibility determinations [ ]or weigh the evidence." *Brainard*, 889 F.2d at 681 (citing *Reynolds v. Secretary of Health & Human Svcs.*, 707 F.2d 927 (6th Cir.1983)).

### B. Severe Impairment

An individual claiming disability "bears the ultimate burden of establishing the existence of a disability." *Cotton*, 2 F.3d at 695. The ALJ resolves whether the claimant suffers a disability by applying the five-step test set forth in the implementing regulations. *See* 20 C.F.R. § 416.920; *see also Young v. Secretary of Health & Human Svcs.*, 925 F.2d 146, 147–48. First, if a claimant is working and this work amounts to substantial gainful activity, the ALJ will find the claimant not disabled, regardless of medical condition. *See* 20 C.F.R. § 419.920(b). Second, the ALJ must determine if the claimant suffers a severe impairment(s). Then, if the claimant suffers a severe impairment, the ALJ proceeds to other tests of disability. Since the ALJ found Long's disability not severe, we review only that question and note that, were we to reverse, we would remand to the ALJ to continue the five-step process.

Here, "[e]valuating the evidence in the best possible light for the claimant the Administrative Law Judge [found] that the claimant performed work activity for no more than three months and that it ended as a result of her impairments. Thus, [working in the convenience store part-time] constituted an unsuccessful work attempt and is not considered substantial gainful activity." Accordingly, the evidence presented by Long satisfied step 1 of the five-step test. The Commissioner did not challenge this finding in subsequent proceedings. Thus, the critical issue in this case, which the ALJ resolved against the claimant, is whether she suffers a severe impairment within the meaning of the regulations.

To conclude that the claimant has a "severe impairment," the ALJ must find that an impairment or combination of impairments significantly limits the claimant's ability to do basic work activity (without considering the claimant's age, education, or work experience).[5] *See* 20

---

5. "Basic work activity" means "the abilities

and aptitudes necessary to do most jobs. Ex-

C.F.R. § 416.920(c); *see also* 20 C.F.R. § 416.921. An "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [claimant's] statement of symptoms." 20 C.F.R. § 416.908. The ALJ must resolve conflicts in the evidence. *See* 20 C.F.R. §§ 416.927, 416.929; *Perales*, 402 U.S. at 399; *Casey v. Secretary of Health & Human Svcs.*, 987 F.2d 1230, 1234–35 (6th Cir.1993). The ALJ need not find credible a claimant's subjective complaints or medical assessments not supported by the medical evidence or the record as a whole. *See* 20 C.F.R. § 416.929; *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir.1997).

In *Higgs v. Bowen*, this court declared that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). The *Higgs* court observed that "this lenient interpretation of the severity requirement in part represents the courts' response to the Secretary's questionable practice in the early 1980s of using the step two regulation to deny meritorious claims without proper vocational analysis." *Ibid.* But the court also recognized that "Congress has approved the threshold dismissal of claims obviously lacking medical merit. . . ." *Ibid.* That is, "the severity requirement may still be employed as an administrative conve-

nience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863. Indeed, the *Higgs* court approved of that practice; it affirmed dismissal because the record contained no objective medical evidence to support Ms. Higgs's claims of severe impairment. Particularly relevant to the case at bar, the *Higgs* court observed. "The mere diagnosis of [an ailment], of course, says nothing about the severity of the condition." *Ibid.* When doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, this court has regularly found substantial evidence to support a finding of no severe impairment. *See, e.g., ibid.* (citing cases).

Caselaw since *Higgs* confirms this circuit's practice in that respect. *Compare Maloney v. Apfel*, 211 F.3d 1269 (table), No. 99–3081, 2000 WL 420700 at *2, (6th Cir.2000) (per curiam) (finding substantial evidence to support denial when record indicated claimant showed symptoms and was diagnosed with disorder but did not contain evidence of a disabling impairment that would prevent work); *and Foster v. Secretary of Health & Human Svcs.*, 899 F.2d 1221 (table). No. 88–1644, 1990 WL 41835 at *2 (6th Cir.1990) (per curiam) (finding substantial evidence to support denial when the claimant produced no evidence regarding the frequency, intensity, and duration of arthritic pain; the record indicated that he was no more than slightly or minimally impaired); *with Burton v. Apfel*, 208 F.3d 212 (table), No. 98–4198. 2000 WL 125853 at *3 (6th Cir.2000) (re-

amples of these include– (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 416.921(b).

versing finding of no severe impairment because record contained diagnoses and remarks from a number of treating physicians and psychologists to the effect that claimant was " 'unable to work ... due to the complexity of her health problems' " (quoting physician)); *and Childrey v. Chater,* 91 F.3d 143 (table). No. 95–1353, 1996 WL 420265 at \*2 (6th Cir.1996) (per curiam) (reversing finding of no severe impairment because record contained an assessment by a consulting physician reflecting a variety of mental problems that left her " 'not yet able to really care for herself alone,' " reports of two other physicians corroborating this, consistent testimony from the claimant, and no medical evidence to the contrary (quoting physician)).

The record in this case does not contain a single statement by a treating physician indicating that Long's health problems result in any specific work-impairing limitations. On the contrary, all medical evidence shows that treatment progressed well and that most of Long's ailments had been resolved or could be treated with prescription and over-the-counter medication. The only medical evidence suggesting Long has any impairment at all comes from the non-examining state agency physicians, who specifically found that she could perform medium-level work. The ALJ discounted Long's non-specific statements about pain and physical limitations because he found her not entirely credible. This record accordingly contains substantial evidence to support the ALJ's finding of no severe impairment that significantly limits Long's ability to do basic work activity, *See Perales,* 402 U.S. at 402 (concluding that "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence ... may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant"); *cf. Higgs,* 880 F.2d at 864 (affirming denial of benefits because nothing backed by objective clinical findings suggested severe impairment; the court gave little or no weight to unsupported medical assumptions and subjective descriptions of pain).

Long argues that her "huge size alone constitutes a severe impairment that would significantly limit her physical ability to perform basic work activities. Similarly, the migraine headaches due to her pseudo tumor cerebri and spinal shunt constitute severe impairments in and of themselves. The combination of the impairments is not only severe, but disabling...." Pl. Br. at 8–9. The medical evidence directly conflicts with her uncorroborated complaints of unresolved headaches, pain associated with the shunt placement, and daily fatigue. Thus, the ALJ had before him more than substantial evidence from which he could conclude that Long's only persistent physical impairment was obesity itself.

*Johnson v. Secretary of Health & Human Services* resolved whether obesity *can be* a disabling impairment under the Social Security regulations. *See Johnson v. Secretary of Health & Human Svcs.,* 794 F.2d 1106, 1112 (6th Cir.1986) (looking to the former Listing 10.10 in 20 C.F.R. Pt. 404, Subpt. P, App. 1 for guidance). The court determined that obesity *can* support a finding of disability because "Section 10.10 reflects a policy decision by the agency that obesity, regardless of type, *can be* a disabling impairment when it is severe and is accompanied by certain complications." *Id.* at 1113 (emphasis added). In reaching this conclusion, the court held that the specific conditions in Listing 10.10 prevailed over the more general statement that a condition reasonably remediable by following medical advice does not amount to a disabling severe impairment. *Ibid.*

(discussing applicability of 20 C.F.R. § 404.1530 to obesity cases). However, *Johnson* in no way held or even implied that obesity alone *always* constitutes a severe impairment.

While typically analyzed in step three of the five-step test, the Listings's treatment of obesity provides guidance in determining whether Long suffers a severe impairment, *cf. id.* at 1112–13, which claim is, as explained above, based on the fact of her obesity alone. Under the Listings in effect through the time of the district court's decision, obesity by itself did not amount to a severe impairment. Instead, the Listing required "[w]eight equal to or greater than the values specified in ... Table II for females (100 percent above desired level)", and one of the following: pain or limited movement in a weight-bearing joint, hypertension, a history of congestive heart failure, chronic venous insufficiency, or respiratory disease.[6] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.09 (1998). That the Listings required additional impairments beyond obesity confirms the ALJ's finding that Long's obesity, unaccompanied as it was by any other specific impairments, does not amount to a severe impairment.[7]

A recent Social Security Ruling, SSR 00–3p (May 15, 2000), which directly addresses the significance of obesity in the step 2 inquiry, confirms this conclusion because it recognizes that obesity will constitute a severe impairment when "it sig-

nificantly limits an individual's physical or mental ability to do basic work activities.... [The Administration] will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 00–3p. Policy Interpretation Question 6. Here, the record does not even suggest that Long's obesity limits her ability to work, notwithstanding the unfortunate difficulties she has had in undergoing medical treatment. The non-treating state physicians reported that Long had few physical limitations and specifically found that she could perform medium-level work. Although Long goes to great lengths to call attention to the fact of her obesity, this by itself does not constitute a severe impairment. Accordingly, we hold that substantial evidence supports the ALJ's finding that Long does not suffer a severe impairment within the meaning of the Social Security regulations.

Finally, Long's arguments about insufficient evidence concerning whether she can perform light or sedentary (less than medium-level) work and the number of suitable jobs in the national economy are unavailing. Those facts are relevant to the fourth and fifth steps of the disability determination. Her claim failed at the second step.

## C. Credibility Determination

Long argues that the record lacks substantial evidence to support the ALJ's

---

6. Long concedes that she does not meet any of the five additional criteria.

7. Drafted after the revised listings went into effect. Long's brief attempts to shoe-horn her obesity into the musculoskeletal disorder Listing by pointing out that the shunt inserted into her spine causes pain, apparently in hopes of securing a remand for further proceedings. *See* Pl. Br. at 11–12. Nothing in the record indicates that she presented this issue to the magistrate judge or the district

court. A litigant may not "raise an issue before the court of appeals that was not raised before the district court." *Young,* 925 F.2d at 149 (citing *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Ralph Schrader, Inc. v. Diamond Int'l Corp.,* 833 F.2d 1210, 1214 (6th Cir.1987)). We nevertheless note that the objective medical evidence shows that any initial complications associated with the shunt were resolved long ago.

finding that she was not entirely credible. Nothing in the record indicates that either party presented this issue to the magistrate judge or the district court. A litigant generally may not "raise an issue before the court of appeals that was not raised before the district court." *Young,* 925 F.2d at 149 (citing *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)); *see also Foster v. Barilow,* 6 F.3d 405, 408 (6th Cir.1992) ("This court is not compelled to hear, nor should it hear, an issue not presented to the district court unless reaching that issue serves an over-arching purpose beyond that of arriving at the correct result in an individual case."). Accordingly, we do not address the merits of Long's second assignment of error.

## III

Because substantial evidence supports the Commissioner's decision finding that Long does not suffer a "severe impairment," we AFFIRM the district court's decision affirming denial of benefits.

